IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 27, 2000

## MICHAEL E. CHRISTIAN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
**No. C41,052     R. Jerry Beck, Judge**

No. E2000-00922-CCA-R3-PC
January 24, 2001

The petitioner, Michael E. Christian, appeals the trial court's denial of his petition for post-conviction relief.  He contends that he did not voluntarily enter his guilty pleas because he was experiencing panic attacks and confusion, which was a side effect of his medication, at the time he entered the pleas.  He also claims that he received the ineffective assistance of counsel because his attorneys did not investigate the effects of his medication on his competency and scared him into pleading guilty.  We affirm the trial court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, attorney for appellant, Michael E. Christian.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; and H. Greeley Welles, Jr., District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In this appeal as of right from the Sullivan County Criminal Court, the petitioner, Michael E. Christian, seeks relief from his 1997 guilty pleas to premeditated first degree murder; especially aggravated robbery, a Class A felony; and especially aggravated burglary, a Class B felony.  Pursuant to agreement, the trial court imposed concurrent sentences of life imprisonment without parole, twenty-five years, and twelve years respectively.  The petitioner was sentenced as a Range I, standard offender.  In a separate case, the petitioner pled guilty to aggravated burglary, a Class C felony; theft of property valued between one thousand and ten thousand dollars, a Class D felony; possession of burglary tools, a Class A misdemeanor; possession of drug paraphernalia, a Class A misdemeanor; and possession of a prohibited weapon, a Class A misdemeanor.  Also pursuant to agreement, the trial court imposed concurrent, Range I sentences of six years and four years for the

felonies and eleven months and twenty-nine days for each of the misdemeanors, the sentences to run concurrently to the sentences in the murder case for an effective sentence of life without parole. The petitioner contends (1) that he was incompetent at the time he entered the guilty pleas, rendering them involuntary, and (2) that he received the ineffective assistance of counsel because his attorneys failed to investigate the effects of his medication on his competency and scared him into pleading guilty. We affirm the trial court's denial of the petition.

At the guilty plea hearing, the state presented the following factual account of the crimes: On June 15, 1995, Mr. and Mrs. Carlo Sloan returned from a trip to discover that someone had burglarized their home and stolen their guns and sterling silver. On June 17, 1995, a Kingsport police officer stopped the petitioner and Alan Ray Hall in the petitioner's car. The officer saw a large amount of silver and some guns in the car. He found a set of brass knuckles, a marijuana pipe, and other items used to smoke marijuana in the car. He also found pry bars, ski masks, gloves, and flashlights, which he assumed were burglary tools. Mr. Hall said that he and the petitioner knew the Sloans were out of town and that they stole silver, guns, knives, and camera equipment from the Sloans' home. The petitioner first claimed that he had inherited the silver from his deceased mother, but he then stated that he bought it from a friend and he assumed it was stolen. The Sloans identified the silver as belonging to them.

With regard to the murder case, the state related that it would prove the following: On October 27, 1995, a family member discovered the deceased victim, Larry Powell, in his home with three gunshot wounds to the back of his head. The perpetrators had broken into the victim's safe with a drill and had stolen guns, money, and the victim's wallet. An autopsy revealed that the victim died on October 25th. Earlier in 1995, the petitioner and Mr. Hall had visited David Scott Thomas. The petitioner told Mr. Thomas that the victim kept a lot of money in his house and outlined a plan to rob the victim. He asked Mr. Thomas to drive the car and offered him one third of the proceeds of the robbery. The petitioner showed Mr. Thomas a nine millimeter pistol that he planned to use to force the victim to turn around and said that he then planned to knock the victim out with a leather slapjack. Mr. Thomas refused to get involved and later saw the petitioner and Mr. Hall casing the victim's house.

Mr. Hall corroborated Mr. Thomas and gave the following account of the murder: The victim invited Mr. Hall and the petitioner, whom he knew, inside after they claimed to have car trouble and asked to use his telephone. The victim turned his back to them and began walking away. The petitioner shot the victim in the back of his head. He and the petitioner retrieved a duffle bag containing a drill and other tools; broke into the safe; and stole three thousand dollars, some guns, and the victim's wallet, which contained five hundred dollars.

The state asserted that Judy Davis, the woman with whom the petitioner was living at the time of the offenses, would testify that the petitioner and Mr. Hall left her home around 9:00 p.m. on October 25, 1995, with a duffle bag containing tools. They returned at 1:30 a.m., removed their shoes at the door, washed their hands, disrobed, and washed their clothes. The petitioner described the murder to Ms. Davis and retrieved a pillowcase from the car. He counted out approximately

three thousand dollars and split it with Mr. Hall. The petitioner told her that he hated that he had killed the victim for so little money. She said that they kept some of the victim's money in the air conditioner. They also placed all of the guns in Ms. Davis's attic, and Ms. Davis saw blood on the petitioner's .22 caliber pistol. The petitioner and Mr. Hall went to Mr. Hall's house to burn some of the victim's papers, the shoes and gloves they had worn during the murder, a holster, and the pillowcase. The petitioner later told Ms. Davis that he and Mr. Hall had cut up his gun and were going to throw the pieces into the river. Police found money in her air conditioner and the victim's guns in her attic. Some of the guns bore the petitioner's fingerprints. From a nearby lake, officers recovered several metal fragments that appeared to be from a gun. A box of .22 caliber shells from Ms. Davis's home matched the bullets removed from the victim. While in jail awaiting trial, the petitioner, who denied committing the murder, wrote a letter to a friend requesting that she and one or two others testify falsely for him.

At the guilty plea hearing, the petitioner stated that he had told his attorneys his side of the events in question, that they had gone over the evidence and the law with him, that he was satisfied with their representation, and that he believed it to be in his best interest to plead guilty. The trial court advised the petitioner of the rights he was waiving. The petitioner asked the court to explain his confrontation and compulsory process rights, and following the court's explanation, he agreed that he understood these rights. He said that he understood that he was the only one who could make the decision to plead guilty and that his attorneys could not make that decision for him. He said that no one had threatened or intimidated him into giving up his rights and that the only reason he was pleading guilty was to avoid the death penalty.

At the post-conviction evidentiary hearing, the petitioner testified that he had experienced panic attacks since his mother's death in 1987 or 1988. He said that during these attacks, he became nervous and sweaty, could not think clearly, and found it difficult to sit still. He stated that he was having panic attacks at the time he pled guilty. He said that he described these symptoms to Dr. Blevins, who had been his doctor since childhood, and that Dr. Blevins prescribed Haldol. He admitted that Dr. Blevins was not a psychologist or a psychiatrist. The petitioner said that when he first started taking Haldol, he felt as if he were in a daze. He said that after taking Haldol for a while, he began to experience stiffness in his joints, was unable to think clearly, and got a headache if he had to think about something in order to make a decision. He said that at the time of his guilty pleas, he was sleeping sixteen to eighteen hours each day and that after pleading guilty, he went back to his jail cell and went to sleep. The jail's medication form reveals that the petitioner received one-half milligram of Haldol twice daily from December 29, 1996, through January 29, 1997.

The petitioner testified that he met with his attorneys four to six times over the one and one-half years that he was in jail. He said that they never explained anything to him or showed him any paperwork. He said that he met with Dr. Engum for a day and a half during which he participated in many tests. He said that he did not tell Dr. Engum that he was experiencing anxiety or nervousness and that he did not remember Dr. Engum asking if he had any physical or mental problems. He said that he did tell Dr. Engum that he was taking Haldol. He stated that his attorneys

did not show him Dr. Engum's report or discuss it with him. He said that he never saw the mitigation assessment prepared in his case.

The petitioner testified that he was not thinking clearly at the time he entered his guilty pleas and that he felt he had no other choice except to plead guilty because of what his attorneys told him. He said that he repeatedly told his attorneys that he was innocent and that he did not want to plead guilty but that they would not listen to his version of what happened. He said that his attorneys told him that if he did not plead guilty, he would "fry" in the electric chair and that his being on death row would be a great hardship for his family. He said that he never would have pled guilty if not for the panic attacks, the effects of the Haldol, and the way in which his attorneys advised him to accept the plea. He said that several weeks after he entered his pleas, his dosage of Haldol was reduced and that he began thinking more clearly and realized that he should not have pled guilty. He said that he was willing to face the possibility of lethal injection in order to proceed to trial.

Dr. Michael Buckner, a psychologist, testified as follows: He interviewed the petitioner on November 5, 1999, and again on December 3, 1999. He also interviewed Dr. Blevins, reviewed the petitioner's medical records and Dr. Engum's report, and looked briefly at the mitigation assessment. He concluded to a reasonable degree of psychological certainty that at the time of his guilty pleas, the petitioner was suffering from panic disorder. Panic disorder is characterized by repeated panic attacks during which the person experiences intense anxiety with no warning. Symptoms include a pounding heart, an accelerated heart rate, sweating, trembling, shortness of breath or the feeling that one is choking, chest pain, nausea, dizziness, and lightheadedness. During a panic attack, the person experiences intense confusion and cannot think through a situation logically or make good decisions. A non-psychologist may or may not recognize that something is wrong with someone having a panic attack. A person having a panic attack can give logical responses depending on the degree of the panic attack, but Dr. Buckner characterized the petitioner's panic attack as fairly severe based upon the petitioner's description. He agreed that the petitioner's answers at his guilty plea hearing appeared to be appropriate but noted that they were short answers and that even during a panic attack, a person can give short answers that seem appropriate without being good. He also noted that Dr. Engum did not diagnose the petitioner as having panic disorder but instead found that the petitioner had depressive disorder and borderline intellectual functioning.

Dr. Buckner also testified that at the time of the guilty pleas, the petitioner was taking Haldol, which is an anti-psychotic medication not given for panic disorder or anxiety. Among the potential side effects of Haldol are confusion, headaches, agitation, muscle cramps, and muscle rigidity. The petitioner reported suffering from muscle rigidity and confusion while on Haldol. When the Haldol dosage was reduced on February 24, 1997, the petitioner's confusion disappeared. For an individual with panic disorder and on Haldol, the stress of facing the possibility of the death penalty would be much greater. If an attorney told the person that he was going to "fry," the person would be thrown into a constant state of panic and would not be able to relinquish his rights rationally or knowingly. In Dr. Buckner's opinion, the petitioner was not competent to plead guilty knowingly and voluntarily. He explained that while Dr. Engum's report related that the petitioner was taking

-4-

Haldol, it did not delve into the history of the petitioner's mental health treatment. Dr. Buckner admitted that he did not interview the petitioner's attorneys.

Charles Edward Adkins, Jr., testified as follows: He was married to the petitioner's cousin and had known the petitioner since the petitioner was a baby. He and other relatives were present when the petitioner met with his attorneys about one hour before the guilty plea hearing. The attorneys told the petitioner that the evidence against him was so overwhelming that if he did not plead guilty, he was going to be facing the death penalty. The attorneys likely used the term "frying." The petitioner seemed to be confused, lethargic, and under a lot of stress.

The petitioner's lead attorney testified that he had participated in twelve capital cases and that he was appointed to represent the petitioner. He stated that he had the petitioner examined by a psychologist, Dr. Engum, and that he considered the information in Dr. Engum's report along with the mitigation assessment in negotiating the ultimate outcome of the case. He stated that he received discovery and that the state was very open with the proof that it intended to present at trial. He said that this was a very difficult case from the petitioner's standpoint: family members would testify that the petitioner talked about committing the robbery over a period of time, the petitioner had attempted to recruit a family member to participate in the crimes, witnesses would testify that the petitioner possessed stolen items shortly after the crime, and the statement of the co-defendant directly implicated the petitioner. He said that although he could not say that any jury would have given the death penalty, he believed that any jury could have given it and that the possibility of a successful defense was very slim. He said that when he thought that a client was going to be convicted of first degree murder and the issue was whether the person is going to receive the death penalty, then it was time to start negotiating a plea.

The attorney testified that he explained to the petitioner all of the elements of the offenses, that the state had to establish aggravating factors, and the evidence available in mitigation. He agreed that the jury could have considered in mitigation the petitioner's intelligence quotient (IQ) of seventy-seven, the fact that he suffered from depression, Dr. Engum's conclusion that his intellectual deficiencies contributed to his being included in the offenses, and the two mitigation themes described in the mitigation assessment – the offenses were very much out of character for the petitioner and if he actually committed the offenses, it was due to his inability to cope with emotional stress. The attorney said that the petitioner adamantly denied committing the offenses and wanted to tell this to the jury. He said that co-counsel's advice to the petitioner was much more forceful but that whatever the language used, co-counsel clearly and unequivocally told the petitioner that he would be convicted of first degree murder. He said that he concurred with this advice. He said that he never told the petitioner that if he went to trial, he would get the death penalty but that he did say that the penalty question would be the only issue. He said that although he understood the legal distinctions between life with and without parole, he told the petitioner that as a practical matter, no distinction existed. He said that if the truth scared the petitioner, then he did not know how to avoid scaring him.

The petitioner's lead attorney testified that he did not recall being told that the petitioner had panic attacks. He said that he saw no indication that the petitioner was confused. He stated that the petitioner was very cooperative, was oriented to his version of the events, and responded logically to what the attorneys told him. He said that he must have known that the petitioner was taking Haldol because it was mentioned in Dr. Engum's report. He said that although he was generally familiar with Haldol, he relied on Dr. Engum to investigate the petitioner's mental health, that Dr. Engum found the petitioner to be competent, and that nothing in Dr. Engum's report told him that this was an issue that needed further investigation. He said that the petitioner's family was present during the attorneys' discussions with the petitioner before the guilty pleas and that they never said that the petitioner did not know what was happening. He said that the petitioner was under great pressure in deciding to give up his life as he knew it, but that he had no way to alleviate that pressure. He stated that he saw nothing to indicate that the petitioner could not voluntarily and knowingly plead guilty.

The petitioner's co-counsel testified that he was appointed along with lead counsel to represent the petitioner. He said that they received discovery and discussed with the petitioner the possible defenses and their likelihood of success. He said that he asked the petitioner to reconstruct the facts and that he felt that the story's believability and the petitioner's ability to convey the story from the witness stand were nil. He admitted that the petitioner's dysfunctional family life and his mother's drug addiction could have been introduced as mitigation. He said that the petitioner never told him that he had panic attacks and that he never saw anything to indicate that the petitioner did not understand what his attorneys were telling him. He said that they requested that the petitioner receive a mental evaluation due to the nature of the case. He stated that the co-defendant was ineligible for the death penalty due to his low IQ. He said that he did not remember Dr. Engum's report stating that the petitioner was on Haldol, but he was sure that they would have discussed the petitioner's medication. He said that he and lead counsel were not aware that the petitioner was sleeping a lot or that he was lethargic. He said that he did not know if he scared the petitioner but that he told the petitioner that he did not think that the jury would believe his story, that he thought the petitioner would be convicted, and that the only question would be the penalty. He said that although the petitioner wanted to tell his story, the petitioner ultimately decided to plead guilty.

The state introduced Dr. Eric Engum's report, which contains the results of his neurological and psychological evaluation of the petitioner. Dr. Engum examined the petitioner in August 1996 and prepared the report the following month. The report reveals that the petitioner had "no obvious signs of preoccupation, perseveration, perplexity or impotence in understanding," although he did require simplified instructions. Dr. Engum noted that the petitioner reported a history of high blood pressure, migraine headaches, and lower back pain but that he denied any history of periods of confusion, disorientation, or clouding of consciousness. The report lists Haldol as a prescription medication taken by the petitioner. It states that the petitioner denied experiencing any significant anxiety, tension, or nervousness but that he demonstrated mild to moderate clinical depression related to his situation. According to the report, the petitioner said that he slept well with no excessive daytime sleepiness. Dr. Engum observed that the petitioner exhibited an average energy level. He related that the petitioner's IQ of seventy-seven placed him in the borderline range of

intellectual functioning. Dr. Engum ultimately concluded that the petitioner was competent to stand trial, although he described the petitioner's competency as a "close call." He noted that it did not appear that the petitioner fully realized that he was at risk for the death penalty. He also commented that assuming the petitioner's version of the events as true, it appeared that the petitioner was dependent upon others to the extent that he could be led into doing things that he would not otherwise do alone.

The trial court found that the petitioner's attorneys were not ineffective for recommending that he plead guilty in light of the distinct risk that he would receive the death penalty. It found that the petitioner's testimony at the evidentiary hearing, particularly the petitioner's claim that he did not understand what he was doing due to the influence of Haldol, was not credible. It similarly gave no credit to the petitioner's allegation that the possibility of receiving the death penalty expressed in harsh terms prevented him from voluntarily pleading guilty. The trial court denied the petition.

## I. VOLUNTARINESS OF THE GUILTY PLEA

The petitioner contends that his guilty pleas were not voluntary because his panic disorder and the confusion he experienced as a side effect of Haldol rendered him incompetent. The state contends that the record supports the trial court's finding that the pleas were voluntary. It argues that the guilty plea transcript reveals that the petitioner understood the proceedings and requested clarification of terms that he did not understand. It further contends that the petitioner's attorneys testified that he was articulate and behaved in a normal manner. We agree with the state.

In a post-conviction case, the burden is on the petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). On appeal, we are bound by the trial court's findings unless we conclude that the evidence preponderates against those findings. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The petitioner has the burden of illustrating how the evidence preponderates against the judgment entered. Id. This court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the trial court. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Questions concerning the credibility of witnesses and the weight and value to be given to their testimony are resolved by the trial court, not this court. Id.

In order for a conviction based upon a guilty plea to comport with due process, the plea must be voluntarily, knowingly, and understandingly entered. Boykin v. Alabama, 395 U.S. 238, 242-44, 89 S. Ct. 1709, 1712 (1969). A guilty plea is not voluntary "if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43, 89 S. Ct. at 1712). Furthermore, if an accused is incompetent, then the guilty plea is involuntary. Blankenship, 858 S.W.2d at 904. The standard for assessing the validity of a guilty plea is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Id. (quoting North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160, 164 (1970)). To assess whether a guilty plea was voluntary, we must "consider all of the relevant circumstances

that existed when the plea was entered." State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995) (citing Brady v. United States, 397 U.S. 742, 749, 90 S. Ct. 1463, 1469 (1970)). These circumstances include:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship, 858 S.W.2d at 904 (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

In this case, the trial court found that the petitioner knowingly, voluntarily, and intelligently entered his guilty pleas. Although it noted that Haldol could affect one's body and mind, the court found the petitioner's claim that he did not understand the consequences of his guilty pleas until weeks later when he was no longer under the influence of the side effects of Haldol to be incredible, noting the following in its findings:

> (a) A fair reading of the forty-five page plea of guilty transcript indicates that the petitioner gave appropriate answers, when he did not understand a term, he so stated, allowing the court to make explanation.

> (b) The general tenor of the plea of guilty transcript indicate[s] understanding.

> (c) The original experienced defense counsel indicated that they believed he was communicating with them quite well. The petitioner, at the plea of guilty hearing, even indicated he had read and signed the "Request for Acceptance of Guilty Plea and Waiver of Rights sheet."

> (d) The court notes that Dr. Michael Buckner, a psychologist, seems to rely in great part upon what the petitioner told him and that Dr. Buckner, although perhaps having a general knowledge of the drug haldol, was not qualified to testify as a specialized expert in the chemical effects of drugs upon the human body, e.g. large dose/small [dose] effect, etc.

The court further found that the petitioner had been deemed competent to stand trial. It concluded that he received effective representation from competent counsel, who "served the petitioner well in recommending life without parole." The court noted as significant the fact that at the guilty plea hearing, the petitioner had expressly assured the court that he was not intimidated and volunteered that he was pleading guilty to avoid the death penalty.

The record does not preponderate against the trial court's findings. Although the petitioner has limited intelligence, both attorneys testified that they reviewed the state's evidence and the elements of the offenses with him. The guilty plea transcript reveals that the court carefully reviewed the rights that the petitioner was waiving. Our review of this transcript confirms the trial court's findings that the petitioner responded appropriately to questions and requested clarification of terms he did not understand. The petitioner, who claims to have suffered from panic attacks since 1987 or 1988, reported no undue anxiety or confusion to Dr. Engum, who examined him the August before he pled guilty on January 28, 1997. The petitioner was also taking Haldol at this time. Significantly, Dr. Engum administered a battery of psychological tests over a day and one half and determined that the petitioner was competent to stand trial. "A person who has been found competent to stand trial has the requisite mental competence to waive his or her rights and enter a plea of guilty . . . ." Berndt v. State, 733 S.W.2d 119, 123 (Tenn. Crim. App. 1987). Finally, although the record does not reveal that the petitioner had any significant experience with criminal proceedings, the petitioner stated at the guilty plea hearing that he understood the rights that he was waiving, that he knew that the decision to plead guilty was his alone, and that he was not pleading guilty as a result of intimidation but because he wished to avoid the death penalty. The trial court credited the petitioner's testimony at his guilty plea hearing over his post-conviction testimony. The petitioner has failed to prove by clear and convincing evidence that his guilty pleas were involuntary.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner also contends that his guilty pleas were involuntary in that they resulted from the ineffective assistance of counsel. He argues that his attorneys were ineffective for failing to investigate his competency despite their knowledge that he was on Haldol and for scaring him into pleading guilty by telling him that he would receive the death penalty if he proceeded to trial. The state contends that the petitioner's attorneys were not deficient for advising him that he faced the death penalty because, given the evidence against the petitioner, a reasonable probability that the jury would return such a verdict existed.

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). When a petitioner claims that ineffective assistance of counsel resulted in a guilty plea, the petitioner must prove that counsel performed deficiently and that but for counsel's errors, the petitioner would not have pled guilty and would have insisted upon going to trial. Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court held that attorneys should be held to the general standard of whether the services rendered were within the range of

competence demanded of attorneys in criminal cases.  Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973).  Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

We also note that the approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct.  If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance.  Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

The petitioner has the burden in the trial court to prove by clear and convincing evidence the factual allegations that would entitle him to relief.  Tenn. Code Ann. § 40-30-210(f).  On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings.  See Black, 794 S.W.2d at 755.  In this respect, the petitioner, as the appellant, has the burden of illustrating how the evidence preponderates against the judgment entered.  Id.  However, we review the trial court's conclusion regarding the effectiveness of counsel de novo because it involves a mixed question of law and fact.  See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

In the present case, the trial court found that the petitioner's attorneys represented him effectively.  It found the attorneys' recommendation that the petitioner plead guilty to be reasonable and competent because of the distinct risk that the jury would impose the death penalty in light of the evidence available to establish the petitioner's guilt as well as the death penalty aggravators.  In relation to petitioner's claims that his attorneys failed to consider that he was mentally ill, could not think properly due to the effects of Haldol, and was incompetent to enter guilty pleas, the trial court found the attorneys to be effective for the following reasons: (1) they sought funding and obtained the services of a psychologist, Dr. Engum; (2) Dr. Engum performed a battery of tests and furnished counsel with a written report concluding that the petitioner was competent; and (3) although the petitioner was taking Haldol, the attorneys believed that he was communicating well.  It further found that the petitioner's responses at the guilty plea hearing indicated that he understood what was happening.

Regarding the petitioner's contention that his attorneys' scared him into entering the pleas because one attorney told him that he would "fry" if he did not plead guilty, the trial court found the following:

> The proof in this case . . . was that the defendant's date of birth was January 12, 1969, he was married, had worked at a meaningful employment, and that as of

about August 1996, had not ". . . fully conceptualized that he was at risk for the death penalty."

Considering that the petitioner was not youthful, was capable of forming an intent to commit a somewhat complicated robbery, it appears that although the words of [his attorney] were harsh, it was perhaps probably time for competent counsel to put the cards on the table. This [his attorney] did with family members present.

After the conversation, original counsel allowed the petitioner to meet with family who were friendly to the petitioner.

Again assessing credibility, original counsel indicated that the petitioner made the decision and at the plea of guilty hearing the petitioner clearly stated the decision to plead guilty was his. He had no complaint against his attorneys at the plea hearing[,] . . . expressed satisfaction with the work of his attorneys, and stated he had not been threatened or [intimidated].

Considering the above . . . proof and the proof as a whole, the court cannot lend credit to the petitioner's testimony that the factual possibility expressed in the harsh words of his original counsel prevented him from rationally and freely surrendering the valuable rights that he had.

(Citations omitted) (quoting from Dr. Engum's report). Based upon these findings, the court determined that the petitioner did not receive ineffective assistance of counsel that rendered his pleas invalid.

Our review of the record confirms the trial court's finding that the attorneys properly relied upon Dr. Engum's report and their experiences with the petitioner in believing him to be competent to plead guilty. First, nothing in the record, including the petitioner's testimony, suggests that the petitioner ever told his attorneys that he was confused or experiencing panic attacks at the time of the guilty plea hearing. Further, the petitioner did not relate these symptoms to Dr. Engum nor did Dr. Engum observe confusion or undue anxiety on the part of the petitioner as he performed a battery of tests, which lasted more than a day. Lead counsel testified that they relied upon Dr. Engum's assessment of the petitioner's mental condition and conclusion that the petitioner was competent. The attorneys observed nothing on the part of the petitioner to belie this conclusion. The petitioner has failed to prove that his attorneys were deficient for not further investigating the potential effects of Haldol on his mental condition.

The petitioner also contends that his attorneys scared him into pleading guilty by emphatically informing him that he would likely receive the death penalty if he did not plead guilty. The law is well-settled that "a guilty plea is not rendered involuntary by the fact that the accused is faced with an election between a possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea." Bratton v. State, 477 S.W.2d 754, 757 (Tenn. Crim. App. 1971); Parham v. State, 885 S.W.2d 375, 381 (Tenn. Crim. App. 1994); see North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct 160, 164 (1970); Hicks v. State, 983 S.W.2d 240, 248 (Tenn. Crim. App. 1998). In fact, in order for a defendant to make "'a voluntary and intelligent choice among the alternative courses of action' available to him, counsel must advise the accused, among other things, of the choices that

-11-

are available to him as well as the probable outcome of these choices." Parham, 885 S.W.2d at 384 (quoting Alford, 400 U.S. at 31, 91 S. Ct. at 164)). If an attorney believes it to be in the defendant's best interest to plead guilty, the attorney should advise the defendant to do so. Id. In so advising, the attorney may use reasonable persuasion to convince the defendant to accept his or her advice. Id. In this case, both of the petitioner's trial attorneys testified that they believed that if the petitioner had chosen to proceed to trial, the jury would have convicted him of first degree murder and the only issue would have been the penalty imposed. Co-counsel testified that he and lead counsel believed that the petitioner's life was on the line and that the jury had enough evidence to impose the death penalty. In light of their view of the strength of the evidence against the petitioner, the attorneys were justified in advising the petitioner that he faced the death penalty and the risk of the jury imposing it was likely.

Although not specifically raised in the petitioner's brief, we assume that the petitioner's argument that his attorneys emphatically advised him of the likelihood of the death penalty refers to his testimony at the evidentiary hearing that his attorney told him that if he did not plead guilty, he would "fry" in the electric chair. The petitioner's co-counsel testified that although he forcibly and unequivocally told the petitioner that he believed that the petitioner would be convicted and that the only question would be what sentence he received, the petitioner seemed unmoved by that information and still wanted to tell his story. Co-counsel said that he did not know if he scared the petitioner but that he just told the petitioner the facts. Lead counsel testified that he never told the petitioner that if he went to trial, he would receive the death penalty. He said that although co-counsel's advice was more forceful than his, he and co-counsel told the petitioner that he would be convicted of first degree murder and that the only issue would be that of the penalty. Both attorneys admitted that co-counsel spoke forcefully to the petitioner. In light of Dr. Engum's conclusion that, as of August 1996, the petitioner did not fully realize that he was at risk for the death penalty and co-counsel's belief that the petitioner was unmoved by his attorneys' advice that he would be convicted of first degree murder, co-counsel's attempt to persuade the petitioner to accept the guilty plea by the use of forceful language was not unreasonable. Parham, 885 S.W.2d at 384 (holding that an attorney may use reasonable persuasion to convince the defendant to accept his or her advice regarding a guilty plea). Thus, the petitioner has failed to prove that he received the ineffective assistance of counsel.

In light of the foregoing and the record as a whole, we affirm the trial court's denial of the petition for post-conviction relief.

 

 

_____
JOSEPH M. TIPTON, JUDGE